***********
The Full Commission has reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Stanback, and the briefs and oral argument before the Full Commission. The appealing party has shown good ground to reconsider the evidence. The Full Commission REVERSES the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over this action.
2. The last date on which plaintiff performed any work for defendant was on or about July 22, 2002.
3. Pursuant to a Form 22 completed by defendant, plaintiff's average weekly wage from January 1, 2001 to January 1, 2002 was $318.58, yielding a compensation rate of $212.40 per week.
4. On January 31, 2002, plaintiff underwent a right carpal tunnel release and trigger finger release on her right third digit by Dr. Stephen Lester.
5. Plaintiff suffered an injury by occupational disease to her right hand that arose out of and in the course of her employment with defendant (I.C. 229703).
6. Defendant denied that plaintiff suffered an occupational disease to her left hand (I.C. 308225) that arose out of an in the course of her employment with defendant on or about January 4, 2002.
7. In I.C. 341289 by Form 21 approved by the Industrial Commission on June 30, 1993, the parties agreed that plaintiff suffered an injury by occupational disease to her left hand that arose out of and in the course of her employment with defendant on or about June 4, 1993.
8. In I.C. 341289 by Form 26 approved by the Industrial Commission in December 1994, the parties agreed that plaintiff suffered a three percent permanent partial impairment to her left hand as a proximate result of the injury by occupational disease to her left hand.
9. Plaintiff received short-term disability benefits from an employer sponsored, non-contributory plan, for which defendant is entitled to a credit in the amount of $4,940.00 for the weeks beginning July 22, 2002.
10. The parties stipulated into evidence plaintiff's medical records, Industrial Commission forms, and correspondence.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is a 65-year-old female who completed the eleventh grade of high school. Plaintiff began working at defendant's Robersonville, North Carolina, facility in 1985.
2. When plaintiff first began her employment with defendant, she performed a "further processing" job that consisted of two separate work tasks, "wing rework" and "salvage rework." She performed this job without interruption from the start of her employment until about 1996.
3. Because of the repetitive motion involved in the performance of the further processing job, plaintiff developed an occupational disease to her left hand in the form of carpal tunnel syndrome on or about February 15, 1993.
4. On May 27, 1993, plaintiff was referred to Dr. S. Lamont Wooten, an orthopedic surgeon, for her left carpal tunnel syndrome. Plaintiff underwent a left carpal tunnel release by Dr. Wooten on June 4, 1993. As a result, on June 9, 1993, the parties entered into a Form 21 for payment of temporary total disability compensation resulting from plaintiff's left carpal tunnel syndrome in Industrial Commission file number 341289. The Industrial Commission approved this Form 21 on June 30, 1993.
5. On September 13, 1993, Dr. Wooten released plaintiff to work, as long as she did not use chain gloves, scissors, or knives. By June 24, 1994, Dr. Wooten released plaintiff from his care and assigned a 3% permanent partial disability rating to plaintiff's left hand.
6. On September 28, 1994, the parties entered into a Form 26 for payment of the 3% permanent partial disability rating to plaintiff's left hand. This rating was subsequently paid to plaintiff.
7. After her left carpal tunnel surgery, plaintiff continued to work at defendant's facility. Plaintiff performed the floor person job salvaging chicken meat and also rotated into the tote washing job. Both jobs were regular production jobs into which other employees also rotated. Plaintiff testified that after she was paid for the rating to her left hand, her left hand symptoms stayed the same for some time.
8. Plaintiff's medical treatment for hand pain resumed in June 1999 with Dr. Bruce Tetalman, a physiatrist who treated plaintiff at the plant Wellness Center. On June 17, 1999, Dr. Tetalman first saw plaintiff for complaints of bilateral hand pain, status post left carpal tunnel surgery. On June 22, 1999, an EMG nerve conduction study was performed that showed a moderate right median sensory motor neuropathy and a mild ulnar motor neuropathy. Dr. F. Chrispin Wilson, a neurologist, noted "some improvement on the left after carpal tunnel surgery as the values are within normal limits." The x-rays of plaintiff's hands, as ordered by Dr. Tetalman and read by Dr. Anil Bathia, a radiologist, showed mild arthritic changes in the interphalangeal joints of both hands.
9. On July 8, 1999, plaintiff returned to Dr. Tetalman and complained of intermittent bilateral hand pain. Plaintiff had no complaints of numbness or dropping objects. Dr. Tetalman observed swelling of the hands and feet, and arthritic changes in plaintiff's finger joints. He diagnosed a probable diabetic neuropathy and generalized osteoarthritis. Dr. Tetalman placed no restrictions on plaintiff resulting from her prior work-related left hand carpal tunnel syndrome. For her non-work related arthritis and diabetic neuropathy, Dr. Tetalman restricted plaintiff's use of scissors and knives to two hours per day and allowed plaintiff to rotate into the job pinning feathers for two two-hour rotations. Defendant accommodated these restrictions.
10. On August 24, 1999, plaintiff returned to the Wellness Center and was seen by Dr. Robert Hansen, a neurologist, who repeated the nerve conduction tests. He found that "compared to the patient's previous studies, the findings are stable and there has been no worsening." On August 26, 1999, Dr. Tetalman's examination revealed loss of motion of the neck, but tests for carpal tunnel were negative. Dr. Tetalman diagnosed non-work related osteoarthritis and allowed plaintiff to work without restrictions. Plaintiff saw Dr. Tetalman for neck pain on October 7, 1999.
11. Plaintiff did not seek or receive any medical treatment for her hands from October 1999 until she returned to Dr. Tetalman on July 6, 2001, with increasing pain and swelling in her right hand. Dr. Tetalman noted that plaintiff had no problems with the left hand since the surgery. Phalen's and Tinel's tests on plaintiff's right hand were negative. Dr. Tetalman ordered blood work to check for rheumatoid arthritis and diabetes. He noted that plaintiff worked as a floor person, and plaintiff informed him that she wanted to continue to work in that position, as the floor person job did not require the use of scissors or knives. On July 11, 2001, x-rays revealed arthritic changes in the joints of plaintiff's hands.
12. When plaintiff returned to Dr. Tetalman on August 9, 2001, she complained of numbness, tingling, pain, and aching in the right hand and wrist. She reiterated that her left hand symptoms had abated since surgery. Dr. Tetalman provided a splint and wristband for her right hand, and a resting splint. Plaintiff again informed Dr. Tetalman that she wanted to continue working as a floor person.
13. A repeat EMG report from August 30, 2001, revealed a progression of plaintiff's right hand symptoms. Dr. Tetalman found advanced carpal tunnel syndrome on the right and advanced motor latency on the left, but no pain related to the left hand.
14. At plaintiff's visit with Dr. Tetalman on September 20, 2001, plaintiff noted improvement after taking an anti-inflammatory medication, although she complained of continued tightness in her right hand. Dr. Tetalman did not restrict plaintiff from the floor person job and he prescribed medication and exercises.
15. On October 8, 2001, plaintiff reported that the exercises made her feel much better. More movement had returned to plaintiff's right hand, but she still had trigger finger in the third finger and pain in the center of the hand. Dr. Tetalman ordered finger splints and continued plaintiff's treatment regimen.
16. When plaintiff returned to Dr. Tetalman on November 8, 2001, she reported feeling much better and had no pain while working full duty. Dr. Tetalman found swelling of several finger joints, but carpal tunnel tests were negative. He recommended possible surgery for the fingers, but allowed plaintiff to continue working full duty.
17. Plaintiff continued to work her regular job as a floor person without the use of scissors or knives. Plaintiff did not return to see Dr. Tetalman and instead was referred to Dr. Stephen Lester for evaluation for possible surgery. Dr. Lester is board certified in orthopedics and sees approximately 50 carpal tunnel patients per year.
18. On January 8, 2002, Dr. Lester first saw plaintiff, who complained that her right middle finger locked and that she had numbness throughout her right hand. Plaintiff gave a history of left hand surgery, but provided no history of current symptoms on the left. The intake form completed for plaintiff contains no complaints regarding her left hand. Dr. Lester's examination revealed triggering of the right middle finger and positive provocation tests on the right. Dr. Lester noted no abnormalities or swelling of the left hand, except for the surgical scar. He diagnosed right trigger finger and right carpal tunnel syndrome and scheduled plaintiff for surgery. Defendant accepted the right carpal tunnel syndrome claim and paid for plaintiff's medical treatment.
19. On January 31, 2002, Dr. Lester performed a right carpal tunnel release and right trigger finger release. Dr. Lester released plaintiff to one-handed duty after her surgery. Dr. Lester placed no restrictions on plaintiff's use of her left hand. According to plaintiff, defendant provided her a position in the nurse's station sorting pills and shredding documents, which plaintiff performed for approximately one month. When plaintiff saw Dr. Lester post-operatively on February 20 and March 20, 2002, her recovery was going well. On March 20, 2002, Dr. Lester allowed plaintiff to begin using her right hand. As a result, plaintiff was moved to the box room, where she worked lining boxes and pushing them down a chute to the production floor. She performed this job for three to four weeks.
20. On April 3, 2002, Dr. Lester's physical examination of plaintiff's right hand revealed full range of motion and good strength in her fingers. He observed no swelling in plaintiff's right hand and no abnormalities or swelling of the left hand. As of April 3, 2002, Dr. Lester released plaintiff to return to full duty without restrictions.
21. On May 1, 2002, plaintiff returned to see Dr. Lester and complained of some pain in her right wrist above the area of the surgery and some lack of extension of the fingers. Dr. Lester noted that plaintiff returned to full duty work, except that she was not using scissors because they pressed on her incision, a restriction with which he agreed. The examination showed less tenderness over the carpal tunnel and full range of motion of the hand, although plaintiff would not fully move her fingers. Plaintiff made no complaints involving her left hand. Dr. Lester felt plaintiff had a good result from surgery, as her sensation had returned and she had no complaints of numbness or triggering.
22. On May 29, 2002, Dr. Lester felt plaintiff was at maximum medical improvement and assigned her a 10% impairment rating to the right hand, primarily because she did not fully regain extension of her middle finger. Dr. Lester's examination found normal wrist motion, with no swelling or deformity. Plaintiff made no complaints of any left hand pain and Dr. Lester did not observe any such problems. Dr. Lester removed plaintiff's prior restriction on the use of scissors. Dr. Lester did not find any basis to place restrictions on plaintiff's left hand and did not feel that plaintiff required any additional medical treatment for her right hand as a result of her carpal tunnel syndrome. Finally, Dr. Lester observed no swelling of the right hand or deficits in the grip strength of the right hand.
23. After Dr. Lester released plaintiff to return to full duty, plaintiff returned to work and rotated between the positions of floor person running the wing splitter machine and tote washer. These jobs were regular jobs performed by other employees. The tote washing job required plaintiff to move empty washed totes, which weighed three to four pounds, from a machine to a conveyor belt. As a floor person, plaintiff was required to pick up bad chicken wings that weighed ounces and put them into a tray. Plaintiff also performed the wing splitter job, taking individual chicken wings and feeding them into a machine which split them. Plaintiff rotated among these jobs at 30-60 minute intervals, as confirmed by a job conditioning form of May 2002.
24. On May 7, 2002, plaintiff was evaluated at the Wellness Center by Dr. James Alexander, board certified in family practice and occupational medicine. Plaintiff was referred to Dr. Alexander for further evaluation of osteoporosis of the spine. Dr. Alexander was not involved in the treatment of plaintiff's carpal tunnel syndrome. At the May 7, 2002 visit, plaintiff described pain in the mid thoracic back, which was of gradual onset and had been present for over a year. At that time, plaintiff related to Dr. Alexander that she was rotating every hour between grading wings and running the wing splitter machine and that the wing-grading job was the part of the job bothering her back. Dr. Alexander recommended that, as a result of her osteoporosis, plaintiff rotate off the wing-grading job every 30 minutes for the next 30 days.
25. Plaintiff made no complaints to Dr. Alexander concerning her upper extremities. Because Dr. Alexander did not treat plaintiff for any upper extremity problems, he did not change Dr. Lester's restrictions. As explained by Dr. Alexander, the restriction on wing grading was for a non-job related back condition and expired after 30 days. As of May 7, 2002, Dr. Alexander felt that both the wing grader job and wing splitter job were suitable for plaintiff.
26. Plaintiff continued working among the jobs of tote washing, floor person, and wing splitting. Plaintiff was not required to use scissors or knives in any of these jobs. Any cutting involved in the floor person job was done by other employees when plaintiff rotated to another position. Plaintiff continued working until she left work on July 22, 2002, due to treatment for breast cancer. According to plaintiff's testimony, if she had not left work due to breast cancer, she would have continued working among the three jobs.
27. Plaintiff `s breast cancer was treated by Dr. Rosa Cuenca, board certified surgical oncologist. At a June 18, 2002, examination Dr. Cuenca noted that plaintiff had normal range of motion and strength in her upper extremities and found no evidence of swelling in either upper extremity. Dr. Cuenca made no determination as to the nature or extent of plaintiff's carpal tunnel syndrome and did not provide any treatment for that condition.
28. On July 22, 2002, Dr. Cuenca performed breast surgery to remove a tumor as well as lymph nodes. On August 14, 2002, Dr. Cuenca provided a note stating that due to the surgery, plaintiff would not be able to use her right arm for repetitive motion, as such motion could cause lymphedema, or swelling, in the arm. After her surgery, plaintiff underwent chemotherapy and radiation.
29. Dr. Cuenca testified that in March 2004, plaintiff reported that she had swelling in her right hand and arm since her surgery, and Dr. Cuenca recommended physical therapy to maintain function in the arm. Dr. Cuenca stated that the swelling in plaintiff's right hand and arm was due to lymphedema. Dr. Cuenca believed that plaintiff's lymphedema was exacerbated by the surgery and radiation, which increases the risk of developing lymphedema in patients who have breast surgery. Dr. Cuenca felt plaintiff could not return to a job where she repeatedly used her right arm, due to the breast cancer surgery.
30. On October 30, 2002 while still undergoing cancer therapy, plaintiff received a second opinion on her hands from Dr. Lawrence Larabee, an orthopedic surgeon. Plaintiff related to Dr. Larabee that she had a right carpal tunnel release and that everything was going well, although her symptoms were not completely resolved. Dr. Larabee's examination showed plaintiff could make a fist with no loss of strength and that she was intact neurosensorilly. Plaintiff was able to flex at her elbow, wrist, and fingers with full strength but had pain in her fingers with flexion and extension. Dr. Larabee took x-rays of plaintiff's hands, which showed mild to moderate osteoarthritis in the joints of the fingers of her hands. Dr. Larabee diagnosed post right carpal tunnel release and trigger finger release and bilateral osteoarthritis of the hands, right greater than left. Dr. Larabee recorded no complaints of left carpal tunnel syndrome and did not observe any swelling in either hand or arm. He assigned plaintiff a 9% rating to her right hand.
31. On June 27, 2003, plaintiff was evaluated by orthopedic surgeon Dr. Gilbert Whitmer who found moderate diffuse swelling of plaintiff's hands, greater in the right than the left. Plaintiff was tender in both wrists and all of the finger joints of both hands. Dr. Whitmer found deficits in extension of the wrists, more on the right, decreased grip strength, and decreased sensation in the fingers.
32. Dr. Whitmer testified that as of June 2003, he would restrict plaintiff from using scissors or knives and that plaintiff had reached maximum medical improvement. Dr. Whitmer assigned a 24% rating to plaintiff's right hand and a 12% rating to her left hand. On the right hand, he attributed 12% to carpal tunnel, 2% to trigger finger, and 10% to arthritis. Dr. Whitmer attributed 8% on the left hand to carpal tunnel and 4% to arthritis.
33. Dr. Whitmer acknowledged that because he did not treat plaintiff prior to June 27, 2003, the physicians who treated plaintiff in 1993 and 1994 for her left hand and in 2002 for her right hand were better able to assess her condition at those times. Dr. Whitmer also agreed that the lack of swelling and the full range of motion and good strength in her hands found by Dr. Lester in May 2002 and by Dr. Larabee in October 2002 was different from his examination of plaintiff over a year later.
34. Dr. Whitmer was not aware of the full extent of the treatment plaintiff received for breast cancer, but agreed that radiation or chemotherapy, particularly large doses of radiation into the right armpit, could have caused the swelling of her hands.
35. Dr. Whitmer neither observed personally nor saw videotapes of the jobs performed by plaintiff. While Dr. Whitmer stated that he would not recommend that plaintiff perform the floor person job based on the condition of her hands, his opinion was based on the assumption that the condition of plaintiff's hands was the same in June 2003 as it was after her surgery. However, when presented with the descriptions of the salvage job, the wing splitter job, and the floor person job, the duties of which were described by plaintiff, Dr. Whitmer felt that these jobs were suitable for plaintiff. Dr. Whitmer suggested no further medical treatment for plaintiff.
36. When plaintiff left work in July 2002, she submitted a leave of absence form seeking a leave of absence for breast cancer surgery. Plaintiff stayed on leave of absence, with excuses provided by Dr. Cuenca. Plaintiff has not sought to return to work with defendant at any time since July 2002. Plaintiff began receiving Social Security retirement benefits, based on her age, retroactive to July 2002. She has not worked, looked for work, nor applied for work since July 2002.
37. The Full Commission gives greater weight to the opinions of Dr. Lester, Dr. Alexander, and Dr. Cuenca than to Dr. Whitmer as to the condition of plaintiff's hands and arms in July 2002. Dr. Lester, Dr. Alexander and Dr. Cuenca saw plaintiff closer in time to July 2002 than did Dr. Whitmer, and plaintiff's condition in June 2003 had changed due to her treatment for breast cancer.
38. The Full Commission finds that any ongoing swelling in plaintiff's right hand and arm was causally related to plaintiff's breast cancer surgery and resulting lymphedema, and was not due to her carpal tunnel syndrome.
39. Plaintiff's claim under I.C. 308225 for a new onset of left carpal tunnel syndrome was denied by defendant by Form 61 dated April 10, 2003. The greater weight of the evidence fails to support plaintiff's claim that she sustained a new injury or occupational disease to her left hand in 2002.
40. The greater weight of the medical evidence fails to establish that plaintiff's osteoarthritis was causally related to her job and constitutes a compensable occupational disease.
41. Prior to breast cancer surgery, plaintiff was able to work in the jobs provided to her by defendant. Plaintiff left work solely due to breast cancer surgery. Thus, plaintiff's inability to earn wages on or after July 22, 2002 was due to breast cancer and was not due to her compensable carpal tunnel syndrome.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff bears the burden of proving each element of compensability in order to prove the existence of an occupational disease under N.C. Gen. Stat. § 97-53(13). This requires plaintiff to show that (1) the disease is characteristic of a trade or occupation; (2) the disease is an ordinary disease of life to which the public is equally exposed outside of the employment; and (3) there is proof of causation. Hansel v. ShermanTextiles, 304 N.C. 44, 283 S.E.2d 101 (1981).
2. Plaintiff received a 10% rating to her right hand on May 29, 2002 and was released to return to work. Plaintiff is entitled to a 10% permanent partial disability rating to her right hand resulting from her compensable right carpal tunnel syndrome for 20 weeks at the rate of $212.40 per week. N.C. Gen. Stat. § 97-31(12).
3. Plaintiff is entitled to all medical expenses incurred or to be incurred as a result of her compensable right carpal tunnel syndrome and trigger finger, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-19;97-25.
4. Plaintiff did not meet her burden of proving that her employment with defendant caused or significantly contributed to the development of left carpal tunnel syndrome. N.C. Gen. Stat. § 97-53(13); Hansel v.Sherman Textiles, supra. Furthermore, plaintiff did not timely assert or suffer a change of condition to her left hand subsequent to the final payment of her claim under I.C. 341289 in September 1994. N.C. Gen. Stat. § 97-47. However, the payment of medical compensation for any treatment of symptoms related to plaintiff's 1993 left carpal tunnel syndrome are compensable under Hyler v. GTE Products Co., 333 N.C. 258, 425 S.E.2d 698
(1993).
5. Plaintiff's rotation between floor person, tote washer, and wing splitter constituted suitable employment within her restrictions for carpal tunnel syndrome. Plaintiff was not able to continue to work due to the development of breast cancer, not due to her carpal tunnel syndrome. Plaintiff's inability to earn wages after July 22, 2002, was due to breast cancer and was not due to any compensable condition. Thus, plaintiff is not entitled to temporary total disability benefits after July 22, 2002. N.C. Gen. Stat. § 97-29.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Under I.C. 308225, plaintiff's claim for the contraction of left carpal tunnel syndrome in 2002 is hereby DENIED.
2. Under I.C. 229073, defendant shall pay a 10% permanent partial disability rating to plaintiff's right hand resulting from her compensable for 20 weeks at the rate of $212.40 per week. Because this compensation has accrued, it shall be paid in a lump sum, subject to an attorney's fee.
3. Defendants shall pay all related medical expenses incurred or to be incurred by plaintiff as the result of her compensable right carpal tunnel syndrome and trigger finger, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability.
4. A reasonable attorney's fee in the amount of 25% is hereby approved to be deducted from sums due plaintiff under paragraph 2 of this Award and paid directly to plaintiff's counsel.
5. Defendant shall bear the costs of this action.
This 30th day of November 2005.
 S/ ______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/ ______________________ DIANNE C. SELLERS COMMISSIONER
 S/ ______________________ PAMELA T. YOUNG COMMISSIONER